**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TRUSTEES OF THE SUBURBAN TEAMSTERS OF NORTHERN ILLINOIS PENSION FUND | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 790 |
| v. | ) | |
| | ) | Judge Bucklo |
| ROBI EXCAVATING, INC. an Illinois corporation, | ) | |
| | ) | Magistrate Judge Ashman |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT**

NOW COME the Plaintiffs, TRUSTEES OF THE SUBURBAN TEAMSTERS OF NORTHERN ILLINOIS PENSION FUND, pursuant to FRCP 56, L.R. 56.1(b)(3)(B), and L.R. 56.1(a)(3), and respond to Defendant ROBI EXCAVATING, INC.'s ("Robi") Motion for Summary Judgment and further move for the entry of summary judgment against Robi, as to liability and damages. In support of its Response and Motion, Plaintiffs submit the following Memorandum of Law. (Plaintiffs' Statement of Uncontested Facts and Response to Defendant's Statement of Uncontested Facts are referenced as (L. R. 56.1 ¶ __).)

**STATEMENT OF FACTS**

The Fund administered by the Plaintiffs ("Fund") is a multiemployer pension plan within the meaning of Section 3(37) and 4001(a)(3) of ERISA, 29 U.S.C. §§ 1002(37) and 1301(a)(3). (L. R. 56.1 ¶ 16.) The Fund is primarily funded by contributions remitted by multiple participating employers pursuant to negotiated collective bargaining agreements on behalf of employees of the participating employers. (L. R. 56.1 ¶ 17.) The Fund is administered at 1275 W. Roosevelt Road, West Chicago, Illinois. (L. R. 56.1 ¶ 21.) All principal and income from

such contributions and investments thereof is held and used for the exclusive purpose of providing pension benefits to participants and beneficiaries of the Fund and paying the administrative expenses of the Fund. (L. R. 56.1 ¶ 18.)

Defendant Robi is an Illinois corporation and is or was engaged in an industry affecting commerce. (L. R. 56.1 ¶ 19.) Robi was subject to a collective bargaining agreement between itself and Teamsters Local 673 ("the Union") requiring Robi to make contributions to the Fund on behalf of certain of its employees. (L. R. 56.1 ¶ 9.) From at least the year ending December 31, 1997 and through the year ending December 31, 2005, employees of Robi performed work for which Robi then made pension contributions to the Fund for its employees represented by the Union, as called for in the collective bargaining agreement. (L. R. 56.1 ¶ 24.)

The Union gave Robi notice of termination of the collective bargaining agreement ("CBA") in 2005. (L. R. 56.1 ¶ 6.) That notice gave Robi notice of the Union's "intent to terminate [Robi's] current collective bargaining agreement upon contract expiration, March 31, 2006." (L. R. 56.1 ¶ 26.) The termination, initiated by the Union, was based on the "one-man unit" rule. (L. R. 56.1 ¶ 7.) Thereafter, December 31, 2005 was the last month for which Robi contributed to the Fund on behalf of its employees for work performed. (L. R. 56.1 ¶ 25.) Robi contributed on only two employees during the period October 1, 2004 through March 31, 2006. (L. R. 56.1 ¶ 27.) One of these employees, Chris Garwacki, was the President of Robi. (L. R. 56.1 ¶ 27.) The other employee, Jesse Silva, only worked during the months of June, July, and August, 2005 during that period. (L. R. 56.1 ¶ 27.)

On July 2, 2007, the Fund Manager for the Trustees, Jose M. Colin, sent Robi a letter stating that, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), as modified by the Multiemployer Pension Plan Amendments Act of 1980, the plan's sponsor was

notifying Robi of the amount of withdrawal liability that it had incurred due to the cessation of its obligations to contribute to the Fund. (L. R. 56.1 ¶ 34.) The July 2, 2007, letter from Mr. Colin was received by Robi in July, 2007. (L. R. 56.1 ¶ 35.) Specifically, the letter stated that Robi had incurred $20,011.00 in withdrawal liability. (L. R. 56.1 ¶ 36.) The letter also stated that Robi's quarterly payment schedule required a quarterly payment of $8,965.00 due on July 15, 2007, a second payment of $8,965.00 due on October 15, 2007, and a final payment of $2,340.00 due on January 15, 2008. (L. R. 56.1 ¶¶ 36, 38.) Further, the letter stated that failure to make any payment when due would make the entire balance immediately due and payable. (L. R. 56.1 ¶ 36.) The letter also notified Robi of ERISA Sections 4219 and 4221 for a description of rights it might have in connection with the assessment of withdrawal liability. (L. R. 56.1 ¶ 36.)

Robi neither requested a review of the withdrawal liability within 90 days of receipt of the July 2, 2007 letter, nor did it at any time request arbitration of its dispute with the Fund. (L. R. 56.1 ¶¶ 42-43.) The amount of withdrawal liability, and the payment schedule, were calculated by the Fund's actuary, using the presumptive allocation method, allowed for under Section 4211(b) of ERISA, 29 U.S.C. § 1391. (L. R. 56.1 ¶¶ 37-38.) Robi admits that it did not pay the July 15, 2007, October 15, 2007, or January 15, 2008 payments, and, indeed, has never made any withdrawal liability payments to the Fund. (L. R. 56.1 ¶¶ 39-41.)

The Trustees of the Fund, through its Fund Manager Jose M. Colin, originally sent a notice of a withdrawal liability determination to Robi on April 29, 2005. (L. R. 56.1 ¶ 31.) This determination was based upon the fact that the Union had severed its collective bargaining relationship with Robi under the "one-man unit" rule, and based upon the fact that Robi had not contributed to the Fund for any months since September, 2004. (L. R. 56.1 ¶ 31.) After receiving no response from Robi, including no request for review or request for arbitration, the

Fund filed suit to collect the withdrawal liability stated in the April 29, 2005 letter, case no. 05-C-5977. (L. R. 56.1 ¶¶ 8-9, 29.) After suit was filed it came to light that although Robi had not paid any contributions to the Fund for work performed during 2005, Robi had been performing bargaining unit work for which it was still obligated to contribute to the Fund. (L. R. 56.1 ¶ 29.) Therefore, after Robi began to defend itself in the case, the case was settled for the amount owed in contributions to the Fund and the Welfare Fund, not for withdrawal liability. (L. R. 56.1 ¶ 29.) The Fund, on behalf of itself and the Welfare Fund, later moved to reinstate the case and for judgment, but withdrew the motion. (L. R. 56.1 ¶ 32.) The settlement agreement consisted of two installment notes, one for the Pension Fund and one for the Welfare Fund. (L. R. 56.1 ¶ 29.) Chris Garwacki, President of Robi, signed each note in his corporate and individual capacity. (L. R. 56.1 ¶ 29.) Each installment note states next to the signatures: "Audit period June, 2005 through August, 2005." (L. R. 56.1 ¶ 29.) The Pension Fund did not enter into the settlement agreement in order to settle its withdrawal liability claim against Robi but merely to receive payment for contributions owed under the collective bargaining agreement. (L. R. 56.1 ¶ 30.)

The withdrawal liability claims in the prior and instant cases were not identical, as the withdrawal pleaded in the prior lawsuit was determined to have occurred during the plan year January 1, 2004 through December 31, 2004 and in the amount of $20,779.00 whereas the withdrawal pleaded in the instant case was determined to have occurred during the different plan year of January 1, 2005 through December 31, 2005 and in the different amount of $20,011.00. (L. R. 56.1 ¶ 44.)

Robi ended up withdrawing from the Fund in 2005, not 2004 as the Fund at first believed, through the expiration of its collective bargaining agreement with the Union on March 31, 2006 and the fact that no employees of Robi performed work within the scope of the collective

bargaining agreement after December 31, 2005 for the remainder of the collective bargaining agreement's term. (L. R. 56.1 ¶ 33.)

## ARGUMENT

Plaintiffs will show as a matter of law that Robi has incurred withdrawal liability and has waived its defenses in not requesting arbitration of the imposition of withdrawal liability. In addition, Plaintiffs will demonstrate that they have complied with all requirements under the law to give notice to Robi of its withdrawal liability, that Robi has defaulted in its payment of withdrawal liability, and that because of Robi's default the entire amount of withdrawal liability, plus applicable interest, costs, and attorneys fees, are due to Plaintiffs.

Although the arguments that Robi raised in its Memorandum in Support of Summary Judgment are waived through its failure to request arbitration, Plaintiffs will further demonstrate why these arguments fail. First, the Union properly invoked the "one-man unit" rule in cancelling its contract with Robi. If Robi had objected to this cancellation it would have acted in accordance with still being bound to the CBA. Another such act would have been continuing to pay into the Fund. Given that Robi has not paid into the Fund since 2005, this demonstrates that Robi did indeed withdraw from the Fund and effectuated a permanent withdrawal. In addition, the prior lawsuit involving these parties was not identical to the instant matter, and further was settled on the grounds of unpaid benefits, not withdrawal liability. Therefore, the prior lawsuit has no bearing on this case, including under the doctrines of *res judicata* or *collateral estoppel*.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P.56(c); *Kamler v. H/N Telcom. Servs., Inc.*, 305 F.3d 672, 677 (7th Cir. 2002). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Fritcher v. Health Care Servs. Corp.*, 301 F.3d 811, 815 (7th Cir. 2002).

The movant bears the burden of establishing that no genuine issue of material fact exits. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir. 1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56(e); *Celotex*, 477 U.S. at 324. A scintilla of evidence in support of the non-movant's position is insufficient, and the non-movant "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *see also Anderson*, 477 U.S. at 250.

## II. ANALYSIS

### A. The Fund is Entitled to Summary Judgment Because the Fund Determined the Amount of Withdrawal Liability, and a Payment Plan Thereto, the Fund Gave Proper Notice, and Robi did not Request Arbitration

#### 1. The Termination of the Collective Bargaining Agreement between the Union and Robi, and Robi's Cessation of Paying into the Fund, Constituted a Permanent Withdrawal from the Fund

Under the Employee Retirement Income Security Act ("ERISA") and the Multiemployer Pension Plan Amendments Act ("MPPAA"), an employer who effectuates a complete withdrawal from a multiemployer pension plan "is liable to the plan in the amount determined . . . to be the withdrawal liability." 29 U.S.C. § 1381. Robi completely withdrew from the Fund at the end of 2005. In doing so the requirements of 29 U.S.C. § 1383 were met: "[A] complete withdrawal from

a multiemployer plan occurs when an employer (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." This is true even in the case, such as with Robi, where a company did not stop doing business but merely ceased to engage in any covered operations and then ceased to be bound to the collective bargaining agreement, as "'covered operations' [under § 1383(a)(2)] refers to those operations which are covered by the collective bargaining agreement (through the relevant bargaining unit definition) for which the employer must contribute to [the] pension plan." *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 872 F.2d 208, 214 n.10 (7th Cir. 1989).

The termination of a collective bargaining relationship, and the concurrent cessation of payments to the respective multiemployer pension plan, constitutes a permanent withdrawal under the MPPAA. *See Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 613 (1986) (upholding the imposition of withdrawal liability trigged by a notice of intent to terminate and a concurrent cessation of contributions). It is undisputed that Robi has not contributed on any persons engaged in covered operations requiring contributions to the Fund after 2005. (L. R. 56.1 ¶ 25.) It is also undisputed that the Union provided Robi with notice to terminate its CBA with Robi in 2005 as of the end of the CBA's term in March, 2006. (L. R. 56.1 ¶¶ 6, 26.) Robi does not assert any facts in its L.R. 56.1 Statement that it objected to the Union's notice to terminate, nor has it contended that it filed an Unfair Labor Practice with the National Labor Relations Board at any time. Further, Robi's behavior in not contributing to the Fund since December, 2005 is in keeping with an understanding that it is no longer bound to the CBA.

Therefore, the collective bargaining agreement between Robi and the Union properly terminated, Robi ceased contributing to the Fund in 2005, and Robi thus effectuated a permanent cessation of any obligation to contribute under the plan.

**2. In Permanently Withdrawing from the Fund, Robi Incurred $20,011.00 in Withdrawal Liability**

In withdrawing from its Fund obligations, Robi incurred withdrawal liability. This is because under 29 U.S.C. § 1381, "When an employer withdraws from a multiemployer plan, the employer becomes immediately liable for its proportionate share of unfunded vested benefits." *Cent. States, Southeast and Southwest Areas Pension Fund v. Hook Up, Inc.*, 2004 U.S. Dist. LEXIS 25881 (N.D. Ill. Dec. 22 2004, J. Grady) (attached to this Memorandum) (citing *Trustees of the Chicago Truck Drivers, Helpters & Warehouse Workers Union (Indep.) Pension Fund v. Rentar Indus.*, 951 F.2d 152, 153 (7th Cir. 1991)). The amount of withdrawal liability is determined by the relevant multiemployer pension fund, which subsequently must notify the employer of that amount and collect that amount. 29 U.S.C. § 1382; *Cent. States, Southeast and Southwest Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663, 666 (7th Cir. 2005).

In notifying the employer of the amount of withdrawal liability, the fund will include a schedule of payments, 29 U.S.C. § 1399(b)(1)(a)(ii), calculated through the provisions discussed in 29 U.S.C. § 1399(c). If a payment is not timely made, and then is not cured within 60 days of notice of the missed payment, the employer is in default and the fund may demand as due the entire amount of outstanding withdrawal liability. 29 U.S.C. § 1399(c)(5); *Robbins v. Chipman Trucking, Inc.*, 866 F.2d 899, 899 (7th Cir. 1988).

In this case, the Fund determined that Robi withdrew from the Fund and that the company incurred withdrawal liability in the principal amount of $20,011.00. Robi admits that it received a notice and demand for payment of withdrawal liability dated July 2, 2007. (L. R. 56.1 ¶¶ 34-35.)

Robi has also admitted that it has not paid any of the withdrawal liability to the Fund. (L. R. 56.1 ¶¶ 39-41.) The time for making all of those payments has passed. (L. R. 56.1 ¶ 36.) Since Robi had not cured its missed payments, and since all of their due dates have passed, the Fund may demand them as due and is now entitled to the entire amount of outstanding withdrawal liability.

**3. Robi has Waived any Challenge to the Fund's Assessment of Withdrawal Liability Because it did not Request Review or Arbitration Within 90 days of the Fund's Notice**

If an employer wishes to contest the withdrawal liability assessment, it must "ask the plan to review its assessment, 29 U.S.C. § 1399(b)(2), and if still dissatisfied, may initiate arbitration" pursuant to 29 U.S.C. §1401(a)(1). *Central States, Southeast and Southwest Areas Pension Fund v. Ditello*, 974 F.2d 887, 888 (7th Cir. 1992); *Central States, Southeast and Southwest Areas Pension Fund v. Bell Transit Co.*, 22 F.3d 706, 707 (7th Cir. 1994) (quoting *Ditello*). "'Arbitration of a dispute concerning a plan's determination of withdrawal liability is mandatory' and if an employer fails to timely initiate arbitration, 'the amount of withdrawal liability assessed by the plan becomes due and owing, and the plan can sue to collect it.'" *Bell Transit*, 22 F.3d at 707 (quoting *Ditello*, 974 F.2d at 888); 29 U.S.C. § 1401(a)(1); *see also Central States, Southeast and Southwest Areas Pension Fund v. Bomar Nat., Inc.*, 253 F.3d 1011, 1016 (7th Cir. 2001) ("'Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title' must be resolved through arbitration." (quoting 29 U.S.C. § 1401(a)(1))). Furthermore, even if an employer requests a review or a review followed by arbitration, the requests "do[ ] not suspend the employer's obligation to pay in accordance with the schedule of payments assessed by the plan." *Id.* (citing *Jaspan v. Certified Industs., Inc.*, 645 F. Supp. 998, 1004 (E.D.N.Y. 1985)). The determination of

the plan sponsor need only be reasonable and on the evidence available. *See Iron Workers Local 473*, 872 F.2d at 213.

It is important to emphasize that even if an employer has a *meritorious* challenge to the Fund's determination, in failing to request arbitration the employer defaults in its ability to do so. *See Robbins*, 866 F.2d at 899 ("Since Congress made it mandatory to resolve withdrawal disputes between an employer and a plan sponsor through arbitration (29 U.S.C. § 1401(a)), Chipman cannot bypass arbitration and litigate a defense to a withdrawal liability claim.").

Robi failed to initiate review or arbitration within the time limits specified in 29 U.S.C. § 1399(b)(2) or § 1401(a)(1), and the time to do so long since passed. An employer must request review of the notice of withdrawal liability within 90 days of receipt of the notice. 29 U.S.C. § 1399(b)(2). In turn, an employer may initiate arbitration within 60 days after the earlier of 1) the date of notification to the employer of the fund's assessment of a request for review, or 2) 120 days after the date of the employer's request for such review. 29 U.S.C. § 1401(a)(1). Here, Robi did not request a review within 90 days of the notice of withdrawal liability, (L. R. 56.1 ¶ 27.), and *even if* it had done so (which, again, it did not), Robi did not initiate an arbitration proceeding. (L. R. 56.1 ¶ 26). Moreover, Robi is in default within the meaning of 29 U.S.C. § 1399(c)(5), since it did not make any of the interim withdrawal liability payments. *Chicago Truck Drivers, Helpers and Warehouse Union (Indep.) Pension Fund v. Century Motor Freight*, 125 F.3d 526, 533 (7th Cir. 1997). Therefore, Robi has waived the right to challenge the withdrawal liability assessment, is in default on the payment of the assessment amount, and the full amount of the withdrawal liability sought by the Fund is now due, together with interest, liquidated damages, attorneys fees, and costs. Furthermore, not only Robi owes the liability, but all trades or businesses under common control. 29 U.S.C. § 1301(b).

**B. The CBA was Properly Terminated Pursuant to the "One-Man Unit" Doctrine**

Although the matter of the termination of the CBA is irrelevant to this case because Robi could only raise the argument through ERISA's arbitration mechanism and has therefore waived its use, assuming *arguendo* that it is relevant Plaintiffs will now address Robi's argument that only an employer can terminate a CBA through the one-man unit doctrine.

That doctrine stands for the simple proposition that *collective* bargaining presupposes more than one employee in a bargaining unit. Therefore, when an employer only employs one or no bargaining unit employees the employer can repudiate the agreement, even at mid-term. *See J.W. Peters, Inc. v. Bridge, Structural & Reinforcing Iron Workers*, 398 F.3d 967, 973 (7th Cir. 2005) ("'It is settled that if an employer employs one or fewer unit employees on a permanent basis that the employer, without violating Section 8(a)(5) of the [National Labor Relations] Act, may withdraw recognition from a union [or] repudiate its contract with the union . . .'" (quoting *Stack Electric, Inc.*, 290 NLRB 575 (1988)). The same policy reason behind the rule must also allow for a union to repudiate an agreement. If a union cannot engage in collective bargaining because there is no "collective" whom an employer employs, then the union can withdraw recognition without violating the National Labor Relations Act.

In this case, Robi only employed two employees during the last 18 months of the CBA, and one of those two, Chris Garwacki, was the President and therefore not a member of the bargaining unit. (L. R. 56.1 ¶ 27). The other worked for only three months, in June through August, 2005. (L. R. 56.1 ¶ 27). This long period of one, or, more often, no bargaining unit employees is more than sufficient to satisfy the one-man unit rule. *See Stack Eletric, Inc.*, 290 NLRB at 577 (finding the existence of ten employees, but all at different times, over the course of five years was not enough to prevent the employer from invoking the one-man unit doctrine). Therefore, because

Robi had only one bargaining unit employee for only three months of the final 18 months of the CBA's duration, the Union could properly terminate the CBA at its expiration.

### C. *Res Judicata* and *Collateral Estoppel* do not Apply to This Action

Another argument that Robi raises, but is precluded from arguing because it failed to request arbitration, is that this action is barred because the Parties already litigated and dismissed with prejudice the same claims. Again, assuming *arguendo*, that Robi can even raise this argument, this use of *res judicata* must fail. Robi admits that the prior case was settled "and by stipulation the case was dismissed with prejudice." (Robi's Memorandum of Law in Support of Summary Judgment, p. 2.) What Robi does not reveal, but cannot deny, is that the prior case was settled in resolution of unpaid contributions, *not* withdrawal liability.

As stated above, the Trustees of the Fund originally sent notice of a withdrawal liability determination to Robi on April 29, 2005. (L. R. 56.1 ¶ 31.) After receiving no response from Robi, including no request for review or request for arbitration, the Fund filed suit to collect the withdrawal liability stated in the April 29, 2005 letter, case no. 05-C-5977. (L. R. 56.1 ¶¶ 8-9, 29.) However, after suit was filed it came to light that although Robi had not paid any contributions to the Fund for work performed during 2005, Robi had been performing bargaining unit work for which it was still obligated to contribute to the Fund. (L. R. 56.1 ¶ 29.) Therefore, after Robi began to defend itself in the case, the case was settled for the amount owed in contributions to the Fund and the Welfare Fund, not for withdrawal liability. (L. R. 56.1 ¶ 29.) The settlement agreement consisted of two installment notes, one for the Pension Fund and one for the Welfare Fund. (L. R. 56.1 ¶ 29.) Chris Garwacki, President of Robi, signed each note in his corporate and individual capacity. (L. R. 56.1 ¶ 29.) Each installment note states next to the signatures: "Audit period June, 2005 through August, 2005." (L. R. 56.1 ¶ 29.)

If the Parties had intended to settle the issue of withdrawal liability through the dismissal of case no. 05-C-5977 with prejudice, it is bizarre that they would do so on behalf of the *Welfare Fund* who was not a party to the case, and, of course, has nothing to do with withdrawal liability. Instead, what happened was the Fund discovered that Robi had not in fact ceased covered operations before the termination of the CBA, which was set to expire in March, 2006, and therefore did not go forward with its claim for withdrawal liability but instead settled for the payment of contributions and brought the Welfare Fund into the deal.

The mere fact that the original complaint averred that withdrawal liability was due does not preclude the instant case. First, "res judicata and collateral estoppel 'do not apply where, as here, the issues or causes of action sought to be precluded in a subsequent proceeding were allegedly determined in a stipulation or a judgment by consent.'" *Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992) (quoting *Gall v. South Branch Nat'l Bank of South Dakota,* 783 F.2d 125, 127 (8th Cir. 1986)). That is the case here, where the case was dismissed through stipulation. Second, the Fund could not have asserted its current claim for withdrawal liability in the prior case. The allegations in the current case are that Robi withdrew from the Fund in 2005. (L. R. 56.1 ¶ 44.) Those in the prior case were that Robi withdrew from the Fund in 2004. (L. R. 56.1 ¶ 44.) Those claims are not identical, and are, indeed, mutually incompatible. In addition, the claim in this case is based upon a detailed analysis by the Fund's actuary which would necessarily be different if one more year's, or one less year's, contributions were thrown into the analysis. 29 U.S.C. § 1391; (L. R. 56.1 ¶¶ 37-38.) Therefore, the current claim was not adjudicated, and could not have been adjudicated, in the prior case and may be ruled on by this Court in the instant action.

**CONCLUSION**

This Court should grant Plaintiffs' Motion for Summary Judgment and deny Robi's Motion for Summary Judgment. Plaintiffs have demonstrated that entry of summary judgment in their favor is appropriate as:

1. There is no issue that Robi completely withdrew from the Fund.

2. There is no issue that the Fund determined the amount of withdrawal liability, and the accompanying schedule of payments, that Robi owes withdrawal liability payments to the Fund, that the Fund notified Robi of the withdrawal liability and schedule, and that Robi never paid any amount of the withdrawal liability.

3. Robi did not request review or arbitration of withdrawal liability.

4. Although it is irrelevant because Robi did not arbitration, the CBA was properly terminated.

5. Although it is also irrelevant because Robi did not arbitration, *res judicata* or *collateral estoppels* from prior litigation between the Parties does not apply to this action.

WHEREFORE, Plaintiffs pray for entry of summary judgment as to liability and an award of damages against Robi Excavating, Inc., and all trades or businesses under common control, for withdrawal liability, interest, liquidated damages, attorneys fees, and costs plus all other relief afforded under 29 U.S.C. § 1132(g)(2), 29 U.S.C. § 1451(b), and 29 U.S.C. § 1451(e).

Respectfully submitted,

TRUSTEES OF THE SUBURBAN TEAMSTERS OF NORTHERN ILLINOIS PENSION FUND, Plaintiffs,

By: /s/ Anthony B. Sanders
One of their Attorneys

JOHN J. TOOMEY
ANTHONY B. SANDERS
ARNOLD AND KADJAN
19 W. Jackson Boulevard
Chicago, Illinois 60604
(312) 236-0415

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TRUSTEES OF THE SUBURBAN TEAMSTERS OF NORTHERN ILLINOIS PENSION FUND | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 790 |
| v. | ) | |
| | ) | Judge Bucklo |
| ROBI EXCAVATING, INC. an Illinois corporation, | ) | Magistrate Judge Ashman |
| Defendant. | ) | |

**PLAINTIFFS'**
**<u>INDEX TO UNPUBLISHED DECISIONS</u>**

1. *Cent. States, Southeast and Southwest Areas Pension Fund v. Hook Up, Inc.*, 2004 U.S. Dist. LEXIS 25881 (N.D. Ill. Dec. 22, 2004, J. Grady)

LEXSEE 2004 U.S. DIST. LEXIS 25881

**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND; and HOWARD McDOUGALL, Trustee, Plaintiffs, v. HOOK UP, INC., a Missouri corporation; and HOOKUP.COM, INC., a Missouri corporation, Defendants.**

**No. 03 C 3194**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**2004 U.S. Dist. LEXIS 25881; 177 L.R.R.M. 2185; 34 Employee Benefits Cas. (BNA) 2754**

**December 22, 2004, Decided**
**December 23, 2004, Docketed**

**SUBSEQUENT HISTORY:** Related proceeding at Teamsters Joint Council No. 83 of Va. Health & Welfare Fund v. Hook Up, Inc., 2005 U.S. Dist. LEXIS 12763 (N.D. Ill., June 15, 2005)

**PRIOR HISTORY:** [*1] 03-3194.041-JCD

**DISPOSITION:** Plaintiffs' motion for summary judgment granted.

**COUNSEL:** For CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, HOWARD MCDOUGALL, TRUSTEE, Plaintiffs: Brad R. Berliner, John Joseph Franczyk, Jr., Cathy L Rath, Central States Law Department, Rosemont, IL; Charles Hoon Lee, Central States Law Department, Rosemont, IL.

For HOOK UP, INC., A DELAWARE CORPORATION, HOOKUP COM INC, A MISSOURI CORPORATION, Defendants: R Ian Hunter, Dean & Fulkerson, P.C., Troy, MI; Ronald A. Damashek, Stahl, Cowen, Crowley LLC, Chicago, IL.

**JUDGES:** John F. Grady, United States District Judge.

**OPINION BY:** John F. Grady

**OPINION**

*MEMORANDUM OPINION*

This ERISA case is before us on the motion of plaintiffs for summary judgment. For the reasons explained below, the motion is granted.

*BACKGROUND*

Plaintiffs Central States, Southeast and Southwest Areas Pension Fund (the "Pension Fund"); Central States, Southeast and Southwest Areas Health and Welfare Fund (the "Health & Welfare Fund") (together, the "Funds"); and the Funds' Trustee Howard McDougall have filed this three-count action against defendants Hook Up, Inc. ("Hook Up") and Hookup.Com, Inc. pursuant to the Employee Retirement Income Security Act ("ERISA"). [1]

1 Plaintiffs name defendant Hookup.Com, Inc. as an entity under the "common control" with Hook Up and thus liable for the withdrawal liability assessment. Defendants admit that as of August 31, 2002, Hook Up owned at least 80% of the total combined voting power of all classes of Hookup.Com stock entitled to vote and/or at least 80% of the total value of shares of all classes of Hookup.Com stock. (Defendants' Response to Plaintiffs' Statement of Material Facts, P 11.) Accordingly, defendants constitute a single

employer within the meaning of section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), and the regulations promulgated thereunder. *See Central States, Southeast & Southwest Areas Pension Fund v. Johnson*, 991 F.2d 387, 388-89 (7th Cir. 1993).

[*2] Hook Up was an employer required to contribute to the Funds on behalf of its employees under collective bargaining agreements executed with various Teamsters Local Unions. On August 31, 2002, Hook Up permanently ceased all covered operations under the Pension Fund.

When Hook Up ceased operations, it effectuated a "complete withdrawal" from the Pension Fund within the meaning of ERISA, 29 U.S.C. § 1383. When an employer withdraws from a multiemployer plan, the employer becomes immediately liable for its proportionate share of unfunded vested benefits. *See* 29 U.S.C. § 1381; *Trustees of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Rentar Indus.*, 951 F.2d 152, 153 (7th Cir. 1991).

ERISA provides that upon withdrawal, a multiemployer pension fund shall "determine the amount of the employer's withdrawal liability, notify the employer of the amount of the withdrawal liability, and collect the amount of the withdrawal liability from the employer." 29 U.S.C. § 1382 (numerals omitted). In October 2002, the Pension Fund calculated Hook Up's withdrawal liability [*3] ($ 2, 782, 644.50) and sent Hook Up a notice of that liability and a demand for payment. Hook Up admits that it did not make any withdrawal liability payments, nor did it initiate arbitration to contest the withdrawal liability assessment. The Funds also claim that Hook Up failed to make contributions based on reported work history in addition to misreporting some employees' work history.

Plaintiffs subsequently filed the instant action seeking payment of withdrawal liability (Count I); delinquent contributions based on reported work history (Count II) and unpaid contributions based on unreported work history that were revealed by an audit (Count III). Plaintiffs also seek interest, liquidated damages, attorney's fees and costs, and audit costs. Plaintiffs now move for summary judgment.

***DISCUSSION***

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering [*4] such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 714 (7th Cir. 1999).

**A. *Withdrawal Liability (Count I)***

While defendants do not expressly concede that the Pension Fund is entitled to summary judgment on its claim for withdrawal liability, they admit that they have failed to make any withdrawal liability payments and that they have failed to initiate arbitration to challenge the Pension Fund's assessment. Moreover, defendants raise no defense to this claim. Accordingly, summary judgment for the Pension Fund will be granted on Count I of the Third Amended Complaint.

**B. *Delinquent Contributions (Count II)***

In Count II, plaintiffs allege that Hook Up was delinquent in making contributions to the Funds based on reported work history, in violation of the relevant collective bargaining agreements. Hook Up admits that it agreed to be bound by the provisions of the Funds' Trust Agreements, which required Hook Up to "make continuing and prompt payment to the [Funds] as required by applicable [*5] collective bargaining agreements." (Defendants' Response to Plaintiffs' Statement of Material Facts, P 21.) During the period of November 2002 through August 2003, Hook Up reported employee work history to the Funds that consisted of individuals on whose behalf contributions were owed while such individuals were receiving workers' compensation pay. According to plaintiffs, Hook Up owes the Pension Fund $ 65,136.00 and the Health and Welfare Fund $ 70,537.30 regarding this reported work history.

Hook Up admits it has not paid the contributions that plaintiffs seek. Hook Up contends, however, that its permanent cessation of operations in August 2002 extinguished any obligations to plaintiffs under any collective bargaining agreements. Hook Up's view is that after September 1, 2002, its obligation to make contributions to the Funds ended because it discontinued

all operations covered by the pension plan.

As plaintiffs point out, Hook Up's argument is based on a misapprehension of the relevant statute. Under ERISA, a complete withdrawal from a multiemployer plan occurs when an employer either (1) "permanently ceases to have an obligation to contribute under the plan" or (2) "permanently [*6] ceases all covered operations under the plan." 29 U.S.C. § 1383. In this case, Hook Up effectuated a complete withdrawal from the plan through the second scenario--permanently ceasing all covered operations. Thus, even though Hook Up withdrew, it did not necessarily cease to have contribution obligations pursuant to the collective bargaining agreements, which required Hook Up to make contributions on behalf of individuals receiving workers' compensation-type pay.

Hook Up cites just two opinions in support of its argument, *Laborers Health & Welfare Trust Fund for Northern California v. Leslie G. Delbon Co.*, 199 F.3d 1109 (9th Cir. 2000), and *Sheet Metal Workers' Int'l Ass'n, Local 206 v. West Coast Sheet Metal Co.*, 954 F.2d 1506 (9th Cir. 1992). Both cases are distinguishable because the collective bargaining agreements at issue had been terminated (in *Laborers Fund*, due to defendant's notice of termination, and in Sheet Metal Workers, due to the union's decertification). Here, the collective bargaining agreements were not terminated.

Hook Up also argues that "it is likely that the dispute concerning whether Hook Up is [*7] obligated for the health and welfare and pension contributions in question for inactive employees, who continue on worker's compensation, is a question exclusively reserved for resolution by the Collective Bargaining Agreement's grievance procedure." (Defendants' Response at 9.) Hook Up cites *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 80 L. Ed. 2d 366, 104 S. Ct. 1844 (1984), in which the Supreme Court recognized that although funds such as plaintiffs are not normally required to exhaust remedies or procedures set forth in a collective bargaining agreement as a means to resolve disputes concerning delinquent contributions before bringing suit, there are exceptions. According to Hook Up, one exception that applies here is a situation where the collective bargaining agreement evidences an intent that a pension fund is expected to utilize the agreement for resolution of specific disputes.

Hook Up does not fully and accurately describe the exception recognized by the Supreme Court in *Schneider*, and the case actually supports plaintiffs' position, not that of defendant. In *Schneider*, the Court ruled that there is no presumption favoring arbitration of disputes between an employer and [*8] an employee-benefit trust fund. Rather, the trust fund agreement must be examined to determine whether the parties intended to condition the trustees' enforcement authority on exhaustion of the arbitration procedures contained in the collective bargaining agreements. 466 U.S. at 371-72.

Although the collective bargaining agreement here does create an arbitration procedure in relation to "questions of interpretation concerning the requirement to make contributions on behalf of particular employees," the agreement does not indicate an intent that the trustees of the Funds were required to exhaust arbitration procedures before seeking judicial enforcement of the contract. Additionally, the Funds' Trust Agreements provide the Trustees with the authority to initiate any legal proceedings that they in their discretion deem to be in the best interest of the Funds, a factor that the Court considered in *Schneider*. As noted *supra*, Hook Up admits that it was bound by the Trust Agreements.

Accordingly, plaintiffs were not required to exhaust any arbitration proceeding set forth in the collective bargaining agreement before bringing suit to seek the delinquent contributions. [*9] Even if the Trustees were required to do so, Hook Up has waived any right to arbitrate the issue. It has participated in this litigation and has answered the Third Amended Complaint. Hook Up failed to raise the issue until now, thus waiving it. *See Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, No. 94 C 774, Minute Order (May 3, 1995) (citing *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995) ("Parties know how important it is to settle on a forum at the earliest possible opportunity, and the failure of either of them to move promptly for arbitration is powerful evidence that they made their election--against arbitration. Except in extraordinary circumstances not here presented, they should be bound by their election.")).

Hook Up's final argument regarding the delinquent contributions claim is that Local 773, the union representing Hook Up's Macungie, Pennsylvania employees, filed a grievance claiming *inter alia* that Hook Up failed to make certain Fund contributions and secured an award relating to the delinquencies "which

*may* be among those demanded by the Plaintiffs in this [*10] litigation." (Defendants' Response at 9 (emphasis added).) Hook Up's argument is both speculative and undeveloped; it fails to offer any evidence that the union's claim overlaps with the claims in this action. Furthermore, while Local 773 may have asserted at one time that Hook Up was liable for Fund contributions, Hook Up admits that the Settlement Agreement executed by Local 773 and Hook Up did not purport to resolve any claims for contributions to the Pension Fund or Health and Welfare Fund.

Plaintiff's motion for summary judgment will be granted as to Count II.

**C.** ***Audit Findings (Count III)***

In Count III, plaintiffs claim that Hook Up owes additional contributions, determined from an audit, based on unreported work history. Plaintiffs have determined that Hook Up owes an additional $ 1,959.60 to the Pension Fund and $ 1,285.60 to the Health and Welfare Fund. Hook Up does not respond to plaintiffs' argument concerning this count, nor does it adequately deny the relevant material facts as set forth by plaintiffs. Hook Up's argument regarding withdrawal, *supra*, does not apply to this claim because the unreported work at issue occurred between February 1998 and [*11] November 2000, before Hook Up's complete withdrawal from the plan. Moreover, we have already rejected defendant's remaining arguments concerning delinquent contributions.

Summary judgment for plaintiffs will be granted as to Count III. Pursuant to the Funds' Trust Agreements, plaintiffs are also entitled to recover the costs of performing the audit because Hook Up failed to pay contributions and interest for the unreported employee work history discovered through the audit.

**D.** ***Interest, Liquidated Damages, Attorney's Fees, & Costs***

According to 29 U.S.C. § 1132(g)(2), "in any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan" the unpaid contributions as well as interest on those contributions, liquidated damages provided for under the plan in an amount not in excess of twenty percent of the unpaid contributions, and reasonable attorney's fees and costs of the action. Because of the mandatory nature of the statute, plaintiffs' requests for interest on the delinquent contributions (as determined from both [*12] the reported work history and from the audit), liquidated damages, costs, and attorney's fees are granted.

***CONCLUSION***

For the foregoing reasons, plaintiffs' motion for summary judgment is granted. Plaintiffs may prepare a draft judgment order in accordance with this memorandum opinion (supported by affidavits as to fees and costs), submit it to opposing counsel for any objections as to form or the amount of fees and costs, and submit a final draft order to the court by January 7, 2005.

DATE: December 22, 2004

ENTER:

John F. Grady, United States District Judge